# In the United States Court of Federal Claims

No. 18-612
(Filed: September 28, 2021)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| FRANK CALAPRISTI, | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Implied-in-fact Contract; Mutuality of Intent; Failure to State a Claim; RCFC 12(b)(6).

*Douglas Edward McKinley, Jr.*, Kennewick, WA, counsel for Plaintiff.

*Albert Salvatore Iarossi*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant.

## ORDER AND OPINION

**DIETZ, Judge.**

Plaintiff, Frank Calapristi, sues for breach of an implied-in-fact contract that he claims existed between the United States and government contractor employees who worked on a United States Department of Energy nuclear site. His case presents nearly identical facts and claims as those in *Turping v. United States*, a directly related case. In *Turping*, the Federal Circuit affirmed this Court's dismissal for failure to state a claim because the plaintiffs had not established mutuality of intent to contract. Before the Court in this case is the government's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims. Because Mr. Calapristi's complaint fails to allege sufficient facts to establish the government's intent to contract, the same defect in *Turping*, the government's motion to dismiss is **GRANTED**.

**I.     BACKGROUND**

    **A.  Factual Background**

The United States operates a plutonium production facility in southeastern Washington called the Hanford Nuclear Reservation (the "Hanford Site"). Am. Compl. ¶ 6, ECF No. 17. Since 1977, the United States Department of Energy ("DOE") has served as the lead government agency in charge of the Hanford Site. *Id*. ¶ 10. From 1982 to 1987, Hanford Engineering and Development Laboratory ("HEDL"), a subsidiary of the Westinghouse Corporation, operated the

Hanford Site under a prime contract with DOE. *Id.* ¶ 11. There were multiple other contractors also performing work on the Hanford Site. *Id*. ¶ 12. In the normal course of operations, when a particular contractor was replaced, employees performing work for the old contractor would continue to perform the same work at the Hanford Site as an employee of the new contractor. *Id*. ¶¶ 19-20. This change in employer apparently caused administrative burdens when transferring individual employee pension plans and associated funds. *Id.* ¶ 23.

To ease the administrative burdens, sometime before 1987, DOE instructed HEDL and other Hanford Site contractors to draft a multi-employer pension plan (the "MEPP") to cover all workers at the Hanford Site. Am. Compl. ¶¶ 30, 34; Am. Compl. Ex. 1. The Hanford Site contractors submitted the MEPP to DOE for review and approval. *Id.* ¶ 39. In 1987, DOE issued a solicitation for a new Hanford Site prime contract, which required the new prime contractor to implement the MEPP. *Id*. ¶ 49. In June 1987, DOE awarded the new prime contract to Westinghouse Hanford Company ("WHC"). *Id*. ¶ 52. Around that same time, WHC and its subcontractors implemented the MEPP "at the direction of DOE." *Id.* ¶ 53. All contractor employees at the Hanford Site became "Participants" in the MEPP. *Id*.

The MEPP states that it was "established effective June 29, 1987 . . . by the Employers for the benefit of Eligible Employees." Def.'s Mot. to Dismiss Ex. A at A6, ECF No. 20 [hereinafter Def.'s MTD].[1] The MEPP sets forth which contractors are "Employers" and which contractor employees are "Eligible Employees." *Id*. at A8-A9. The MEPP is administered by an independent pension committee (the "Plan Administrator") charged with the authority to control and manage the MEPP, including the ability to modify the plan, determine questions relating to eligibility, and compute the amount and type of benefits payable to any plan participant. *Id.* at A40-A41. Most relevant to Calapristi's complaint, Article 29 of the MEPP, titled "Terminations for Transfer," states:

> In the case of a Termination for Transfer, an Employee who becomes a Participant hereunder shall be entitled to credit for eligibility under Article 2, benefit accrual under Article 3 and vesting under Article 6 to such a degree as shall be determined by the Plan Administrator in order to assure that the Participant receives a benefit at normal retirement date *which is reflective of his years of service on the Hanford Reservation*. The Plan Administrator's decision shall be adopted by a rule pursuant to Article 11. *A Termination for Transfer means a termination from one contractor on the Hanford Reservation to another [contractor] which is determined to be in the best interests of the government*.

*Id*. at A79 (emphasis added).

In 1996, DOE again solicited bids for a new Hanford Site prime contractor. Am. Compl. ¶ 75. The new prime contract, referred to as the Project Hanford Management Contract, had a transition date of October 1, 1996. *Id*. The solicitation required the new prime contractor and its

---

[1] The Court may consider documents attached to a motion to dismiss as part of the pleadings if they are referred to in the plaintiff's complaint and are central to their claim. *Ambrose v. United States*, 106 Fed. Cl. 152, 156 n.4 (2012); *see also Brooks v. Blue Cross and Blue Shield of Fl., Inc.*, 116 F.3d 1264, 1269 (11th Cir. 1997); *Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

major subcontractors to hire employees from the workforce of the incumbent prime contractor and its subcontractors and to "assume the assets, liabilities, and other obligations and continue the defined benefit pension plans . . . of the incumbent contractor and integrated subcontractors." *Id.* ¶¶ 78-79. In this regard, the eventual prime contractor, Fluor Daniel Hanford, Inc. ("FDH"), submitted a bid whereby most of the Hanford Site workforce would continue to participate in the MEPP; however, a portion of the workforce would be assigned to new entities referred to as the "Enterprise Companies." *Id.* ¶ 82. The Enterprise Companies would be subcontractors to FDH and would not become "sponsoring employers" under the MEPP. *Id.* ¶¶ 82, 84.

DOE announced on August 6, 1996 that management of the Hanford Site would be transferred from WHC and its subcontractors to FDH and its subcontractors on October 1, 1996. Am. Compl. ¶ 88. As part of the transfer, DOE executed a Transfer Agreement with WHC and FDH, which set forth, *inter alia*, which employers "would leave the MEPP and which would remain." *Id.* ¶¶ 91-93. Since the Enterprise Companies did not become "Employers" under the MEPP, the MEPP was modified to provide that Enterprise Company employees, which included Calapristi, would remain "Participants" in the MEPP; however, upon retirement, their respective retirement benefits would be calculated using the highest five-year salary (the "High-Five Benefit") during their service at the Hanford Site and would not include the number of years worked for the Enterprise Company. *Id.* ¶ 103. As a result, on or about October 2014, when employees of the Enterprise Companies began to retire and seek pension benefits under the MEPP, the Plan Administrator began paying benefits based on the High-Five Benefit approach, not the total years of service at the Hanford Site. *Id.* ¶¶ 136-37. Calapristi alleges this is a breach of an implied-in-fact contract that existed between the government and Enterprise Company employees, and he now seeks relief for the alleged breach. *Id.*

B.  **Procedural History**

Calapristi filed his original class action complaint on April 30, 2018. Compl., ECF No. 1. The case was stayed shortly thereafter pending the outcome of *Turping v. United States*, 134 Fed. Cl. 293 (2017), *aff'd*, 913 F.3d 1060 (Fed. Cir. 2019), a related case on appeal before the Federal Circuit. *See* Notice of Directly Related Cases at 1-2, ECF No. 2 (stating the *Turping* case alleges "an essentially identical legal claim").

In *Turping*, a group of former Hanford Site workers employed by Lockheed Martin Services, Inc. ("Lockheed"), one of the Enterprise Companies, alleged an implied-in-fact contract with the government. *Turping*, 913 F.3d at 1060. The *Turping* plaintiffs claimed that DOE breached the contract by changing the benefits that the Lockheed employees were entitled to receive under the MEPP. *Id.* at 1064. This Court dismissed the case finding that the employees failed to allege facts sufficient to establish that the government intended to enter an implied-in-fact contract with the employees. *Turping*, 134 Fed. Cl. at 306-07. The Federal Circuit affirmed the dismissal finding that the employees failed to meet their burden of proving mutuality of intent. *Turping*, 913 F.3d at 1065.

After the Federal Circuit affirmed the dismissal, the Court lifted the stay, and Calapristi filed an amended complaint, setting forth additional facts by which he hopes to cure the defects present in *Turping*. *See* Am. Compl. The government subsequently filed a motion to dismiss for

3

lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted. Def.'s MTD at 23. After the motion was fully briefed, the Court conducted oral argument. *See* ECF No. 27. Upon motion by Calapristi, the Court held a supplementary oral argument after reassignment of the case to the undersigned. *See* ECF No. 35.

## II.   LEGAL STANDARDS

A challenge to this Court's ability to "exercise its general power with regard to the facts peculiar to the specific claim" is properly raised by a Rule 12(b)(6) motion. *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999). When deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court construes the complaint's allegations in favor of the plaintiff. RCFC 12(b)(6); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982). The Court must inquire whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the Court must assess whether "a claim has been stated adequately" and whether "it may be supported by [a] showing [of] any sets of facts consistent with the allegations in the complaint." *Id.* at 563. The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555.[2]

## III.   DISCUSSION

This case presents nearly identical facts and allegations to those in *Turping*. *See* Pl.'s Resp. at 2 ("The Plaintiffs in this matter are a different group of Hanford workers who are making essentially the same claim against the [g]overnment as the Plaintiffs in *Turping*."), ECF No. 23. Calapristi seeks to distinguish his case from *Turping* by manufacturing a "test" derived from a footnote in the Federal Circuit's *Turping* decision and presenting additional facts that he argues demonstrate mutuality of intent. *Id.* at 10-11; *see also Turping*, 913 F.3d at 1067 n.2. The government asserts that, even with the additional facts, the *Turping* decision controls the outcome of this case. Def.'s MTD at 1-3. Because the additional facts presented by Calapristi fail to demonstrate the government's intent to contract—the same defect identified in *Turping*—his complaint likewise must be dismissed.[3]

Like the plaintiffs in *Turping*, Calapristi has the burden of proving the existence of an implied-in-fact contract. *Pac. Gas & Elec. v. United States*, 3 Cl. Ct. 329, 339 (1983), *aff'd*, 738 F.2d 452 (Fed. Cir. 1984). An implied-in-fact contract with the federal government requires: (1)

---

[2] The government also seeks to dismiss Calapristi's complaint under RCFC 12(b)(1). The government asserts that Calapristi fails to properly plead the elements of a contract with the government, and, therefore, the complaint should be dismissed for lack of subject-matter jurisdiction. Def.'s MTD at 23. Calapristi's complaint alleges an implied-in-fact contract with the government, and this Court has jurisdiction under the Tucker Act to adjudicate "any claims against the United States founded . . . upon *any express or implied contract* with the United States." 28 U.S.C. § 1491 (emphasis added). Based on the allegations, Calapristi's complaint survives the government's motion to dismiss on jurisdictional grounds. *See Trauma Serv. Grp., Inc. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (a well-pleaded allegation of an implied-in-fact contract is sufficient to overcome a jurisdictional challenge).

[3] The Court does not consider the remaining three required elements of an implied-in-fact contract because the Court dismisses the complaint on the grounds that Calapristi fails to prove mutuality of intent—a threshold condition.

mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) "actual authority" on the part of the government's representative to bind the government in contract. *Id.*; *see City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). While the requirements for an implied-in-fact contract are indistinguishable to those for an express contract, the nature of the evidence differs. *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003). Implied-in-fact contracts are agreements "founded upon a meeting of minds and [are] inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Trauma Serv. Grp., Inc. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (quoting *Hercules, Inc. v. United States*, 526 U.S. 417, 424 (1996)). An agreement will not be implied "unless the meeting of minds was indicated by some intelligible conduct, act or sign." *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 598 (1923). "In short, an implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates mutual assent." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998).

Most critical to this case, binding precedent clearly establishes that mutuality of intent to contract is a threshold condition for contract formation. *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003). A plaintiff cannot meet its burden if it fails to show mutuality of intent. *Hanlin*, 316 F.3d at 1330; *see also Columbus Regional Hospital v. United States*, 990 F.3d 1330, 1344-45 (Fed. Cir. 2021) (finding plaintiff failed to meet its burden of establishing mutual intent to contract).

Calapristi argues that an implied-in-fact contract arose from the government's offer "that if the employees worked at the Hanford [S]ite, the [g]overnment would fund the MEPP and enforce Article 29 of the MEPP." Am. Compl. ¶ 69. To advance his argument, Calapristi strings together the government's conduct in connection with the MEPP to demonstrate that the government intended to be contractually bound to Enterprise Company employees, like Calapristi, under the MEPP. *Id.* ¶¶ 30, 38-41, 45-46, 49, 53. The problem for Calapristi is that this argument mirrors the argument rejected by the Federal Circuit in *Turping*.

In *Turping*, the Federal Circuit found that "nothing in the MEPP indicates intent by the [g]overnment to be in privity of contract with Lockheed's employees." 913 F.3d at 1066. The MEPP does not list the government as a party to the contract and only evidences a contractual relationship between the participating employers and employees. *Id.* The MEPP also specifies that the Plan Administrator, not the government, is the entity that funds the plan and makes benefits determinations. *Id.* The Federal Circuit concluded that the "[g]overnment funds Lockheed and other [e]mployers to manage Hanford, but there is no evidence that the [g]overnment intended to be contractually obligated to Lockheed's or other [e]mployer's employees, either through the MEPP or by other means." *Id.* at 1067. For these same reasons, Calapristi's argument in this case also fails.

To salvage his complaint from the same outcome as *Turping*, Calapristi manufactures a "test" derived from the following footnote in the Federal Circuit's *Turping* decision:

> Appellants argue that WHC acted as the [g]overnment's "agent" in drafting Article
> 29 of the MEPP, which provided for Hanford workers to receive benefits reflective

5

of their total years of service. Appellants do not plead sufficient plausible facts to support this agency argument. Likewise, Appellants cannot support their broad allegation that only the [g]overnment—a non-party to the MEPP—had the authority to "enforce" Article 29 and compel subcontractors to remain in the MEPP.

913 F.3d at 1067 n.2 (citations omitted). Calapristi states that this footnote "essentially [lays] out a roadmap for . . . the Court to determine whether the parties' conduct in this matter demonstrated the requisite mutual assent to form a contract." Pl.'s Resp. at 10. Calapristi argues all that is needed to demonstrate the government's intent is a showing that: (1) the WHC acted as an agent of the government in drafting Article 29[4] and (2) only the government had authority to enforce Article 29 and compel contractors to remain in the MEPP. *Id*. Calapristi presents "new facts" to satisfy his "test."

The Court is not persuaded by Calapristi's interpretation of the *Turping* footnote or the "new facts" alleged in his amended complaint. Calapristi overstates the meaning of the footnote. The footnote did not create a "test" for demonstrating intent to contract—a well-established threshold condition for contract formation—but instead simply rejected alternative arguments raised, but not sufficiently supported, by the *Turping* plaintiffs. The defect identified in *Turping* is the plaintiffs' failure to provide any evidence of the government's intent to contract, and the new facts presented in this case, however packaged, do not remedy this defect.

Calapristi points to a sworn statement from Ernest Vodney ("Vodney") to satisfy the first prong of his "test" by showing that HEDL, the prime contractor whose employees assisted with drafting the MEPP, was acting as an "agent" of the government in drafting Article 29 of the MEPP. *See* Am. Compl. Ex. 1 [hereinafter Vodney Decl.]; *see also* Am. Compl. ¶ 35. Calapristi argues that the sworn statement "shows conclusively that the [g]overnment contractor, HEDL, was acting under contract with the DOE and at the explicit direction of the DOE" when it created the MEPP and "was thereby acting as an 'agent' of the [g]overnment." Pl.'s Resp. at 11. Calapristi presumably advances this agency argument to avert the general rule that subcontractors—like Calapristi and other Enterprise Company employees—are not in privity of contract with the government. *See Turping*, 913 F.3d at 1066.

This argument is unpersuasive. Vodney was employed as the Controller at HEDL and was one of two employees of HEDL involved in drafting the MEPP. Vodney Decl. ¶ 6; Pl.'s Resp. at 11. To establish a contract with the United States, the plaintiff must show that the government representative who entered or ratified the agreement had actual authority to bind the government. *Trauma Serv. Grp*, 104 F.2d at 1326; *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984), *cert denied*, 474 U.S. 818 (1985). While it may be true that DOE tasked HEDL with drafting the MEPP, HEDL was acting in its role as a government

---

[4] There appears to be a factual discrepancy with which contractor was directed by DOE to draft the MEPP. The *Turping* plaintiffs' stated "WHC . . . draft[ed] Article 29 of the MEPP[,]" *Turping*, 913 F.3d at 1067 n.2 (citing Appellant Op. Br. at 54), and Calapristi states HEDL and various Hanford Site contractors drafted the MEPP. Am. Compl. ¶ 30. Resolution of this discrepancy is not necessary for the Court to reach its decision. Whether it was WHC or HEDL, Calapristi's agency argument still fails because there is no evidence that either contractor was acting as an authorized agent of the government in connection with the MEPP.

contractor—and Vodney as an employee of a HEDL—when drafting the MEPP. Neither were acting as an agent of the government with authority to bind the government to contractual obligations. *See BGT Holdings LLC v. United States*, 984 F.3d 1003, 1015 (Fed. Cir. 2020) (actions by unauthorized government employees do not bind the government). There is no clear contractual consent for HEDL or Vodney to act as an agent of the government with respect to the MEPP, and nothing in the MEPP or otherwise provides that the government will be directly liable to participating employees under the MEPP. *See Central Freight Lines, Inc. v. United States*, 87 Fed. Cl. 104, 110 (2009) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983)).

To satisfy the second prong of his "test," Calapristi points to the Transfer Agreement executed by DOE, a DOE policy governing pension programs, and various press releases issued by DOE to show that the government exclusively controlled the operation and enforcement of Article 29 of the MEPP. Am. Compl. ¶¶ 47, 93-95, 100, 102, 116; Pl.'s Resp. at 2-3.

Calapristi argues that the Transfer Agreement "demonstrates conclusively that the [g]overnment, as a party to the Transfer Agreement, exercised complete and total control over which subsequent contractors (and thus which Hanford [S]ite employees) would be included in the MEPP." Pl.'s Resp. at 12. The purpose of the Transfer Agreement was to "facilitate an orderly transfer of . . . documents, agreements and property" between the contractors, and, in furtherance of this purpose, it addressed a broad spectrum of Hanford Site operational and management items. Am. Compl. Ex. 3 at 50. While the fact that DOE was a party to the Transfer Agreement may show that DOE exercised control over which contractors would assume liability and responsibility for the MEPP, as the Federal Circuit made clear in *Turping*, the degree of government involvement or control over a government project does not indicate an implied-in-fact contract enforceable against the government. 913 F.2d at 1066-67. The control exercised by DOE as a party to the Transfer Agreement is a natural part of DOE's role as lead government agency at the Hanford Site overseeing the transition between contractors and ensuring continuity of operations. This control does not evidence DOE's intent to enter a contract with government contractor employees. Further complicating this argument is the fact that the Transfer Agreement does not indicate any government role in the administration of the MEPP and instead assigns all administrator responsibilities to the new prime contractor, FDH. Am. Compl. Ex. 3 at 65 ("FDH accepts all responsibility as administrator for the [MEPP.]").

Calapristi next points to DOE Order 3830.1 (the "Order") to demonstrate that "DOE had the 'authority' to enforce Article 29 and compel subcontractors to remain in the MEPP" and "also the responsibility to do so." Pl.'s Resp. at 13. The purpose of the Order is "to establish policies, procedures, responsibilities, and authorities relating to establishment, continuity, and termination of pension programs applicable to operating and onsite service contracts" and to set forth objectives and requirements for "pension programs funded by DOE." Am. Compl. Ex. 2. at 37-38, 40. However, nothing in the Order demonstrates the government's intent to establish privity of contract with anyone, let alone government contractor employees. *See D & N Bank v. United States*, 331 F.3d 1374, 1378-79 (Fed. Cir. 2003) ("[P]erformance of . . . regulatory or sovereign functions [do] not create contractual obligations."). Further, Calapristi does not identify any specific provision in the Order that provides DOE with the authority or

responsibility to enforce Article 29 of the MEPP. By issuing this Order, the government does not intend to bind itself in contract. *See Turping*, 134 Fed. Cl. at 307 (citing *Anderson*, 344 F.3d at 1357) ("DOE Order 350.1 does not evidence an intent to contract with Plaintiffs, because it is a 'regulation of an executive agency,' and 'regulatory proclamations are insufficient to create contractual obligations.'"); *see also Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985).

Calapristi also identifies four press releases which he argues "makes . . . clear that it is the DOE, and the DOE alone, who decides which Hanford area employees will be included in the MEPP when there is a change in contractors." Pl.'s Resp. at 12. Three of the press releases identified by Calapristi communicate information about upcoming Hanford Site solicitations, and one communicates information about pension benefits for individuals accepting employment with Enterprise Companies. *See* Am. Compl. Ex. 4 at 76-88. These press releases illustrate DOE's oversight function as the lead government agency at the Hanford Site. None of the press releases provide any indication that the government intends to create privity of contract with government contractor employees, and this degree of government involvement does not indicate an implied-in-fact contract enforceable against the government. *Turping*, 913 F.2d at 1066-67.

## IV.   CONCLUSION

As in *Turping*, the underlying defect in this case is a failure to establish intent by the government to enter a contract. Without sufficient facts to demonstrate mutuality of intent, Calapristi fails to meet his burden of proving an implied-in-fact contract, and his complaint must be dismissed under RCFC 12(b)(6).

For the reasons set forth in this opinion, the government's Motion to Dismiss is **GRANTED**. The Clerk of the Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge